33 F.3d 54
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Shannon Dorman EMERY, Plaintiff-Appellant,
v.
BROWN-FORMAN CORPORATION; Lois Musselman Mateus; Nancy
McCoskey, Defendants-Appellees.
 No. 93-5328.
 United States Court of Appeals, Sixth Circuit.
 Aug. 23, 1994.
 
 Before: KEITH and BATCHELDER, Circuit Judges; and JOINER, District Judge.*
 PER CURIAM.
 
 
 1
 On August 6, 1991, Shannon Emery brought this action against Brown-Forman Corporation, Lois Musselman Mateus and William Jett alleging violations of the Federal and Kentucky Civil Rights Acts based on intentional gender discrimination in violation of 42 U.S.C. Sec. 2000e and Ky.Rev.Stat.Ann. Sec. 344.040 (Baldwin's 1986). Emery voluntarily dismissed her complaint against Jett. On December 3, 1992, Emery amended her complaint to add Nancy McCoskey as a defendant and to assert a claim of intentional infliction of emotional distress against Mateus and McCoskey. Also, more than one year after filing the complaint, Emery requested a jury trial. After permitting oral argument on the issue, the district court denied Emery's request for a jury trial. On February 9, 1993, the district court granted the defendants' motion for summary judgment, and Emery timely appealed. For the reasons set forth below, we affirm.
 
 
 2
 * Shannon Emery was employed by the Brown-Forman Corporation from December 10, 1985 until her termination on November 27, 1989. From December, 1985 to June 1989, Emery worked in the maintenance department as an "Administrator". The department was directed by William Jett. From June 1989, until her termination in November, 1989, Emery was an "Administrator" for Travel Administration/Shareholder Services ("TA/SS").
 
 
 3
 The maintenance department is housed in a warehouse-type building distinct from Brown-Forman's office facilities. At the time of her placement in that department, Emery was the only female in the department. Emery performed her job satisfactorily and, as a result of favorable evaluations from Jett, her salary rose from $16,500 to $22,550 in less than four years.
 
 
 4
 It is undisputed that Emery's supervisor, William Jett, was, as the district court noted, "an unrefined man of questionable integrity." He regularly made sexists comments, used vulgar language and displayed sexually explicit figurines in his office. Emery alleges that a "severe episode of harassment" occurred in September, 1986, in which Jett stood very close to her and offered her an alcoholic drink in the office after hours. Emery does not allege that Jett touched her or made suggestive remarks. She simply alleges that Jett, "invaded her space."
 
 
 5
 Emery did not inform any other supervisors or any member of Brown-Forman management of the alleged harassment at the time it occurred nor did she file a complaint or grievance under Brown-Forman's anti-harassment policy. In June, 1989, Emery was promoted to a position in the Corporate Communications/Corporate Services department as the TA/SS Administrator. In the interim between securing her promotion and beginning her new position, Emery reported to management alleged financial irregularities perpetrated by Jett and her allegation of sexual harassment. Jett and another maintenance department employee were suspended the same afternoon that Emery reported the conduct and both were later terminated. Brown-Forman's human resources department began investigation of the alleged sexual harassment but Emery indicated she did not want to further pursue her complaint regarding Jett's behavior.
 
 
 6
 On June 16, 1989, Emery began her new position as TA/SS Administrator. Emery worked under both Nancy McCoskey, Manager of Travel Administration, and Linda Gering, Manager of Shareholder Services. Lois Mateus was Senior Vice-President of Corporate Communications/Corporate Services and had responsibility for the entire department. Emery's new position was much more visible and public oriented than her former position in the maintenance department and required a significant increase in responsibility.
 
 
 7
 Initially Emery received positive reviews in her new position, but her reviews quickly soured. Emery's supervisors testified that she soon proved to be deficient in necessary computer, organizational and communication skills. Concerns also arose regarding Emery's style of dress and her interpersonal skills.
 
 
 8
 In August, 1989, Mateus advised Emery that "the jury was still out" on whether Emery could effectively perform the functions required of the TA/SS Administrator. Mateus offered Emery the opportunity to return to the maintenance department, where she had performed effectively, without a change in her salary or grade level. Following the meeting with Emery, Mateus sent a note to McCoskey and Gering stating "[i]f she opts to stay here, please put her on a development plan to improve the maturity of her response and develop a more professional image." Ultimately, Emery chose to remain in her TA/SS Administrator position.
 
 
 9
 Problems and criticisms involving Emery's performance escalated in September and October, 1989. For example, in mid-October, 1989, a shareholder requested a stock certificate be issued for her shares; instead Emery directed the bank to sell all of the stockholder's shares. Emery's handling of charter flight arrangements proved problematic to the point that McCoskey was forced to assume the responsibility of scheduling the Chairman and CEO's charter flights.[1] Emery's supervisors also noted that she was becoming increasingly hostile and continuously had problems meeting deadlines.
 
 
 10
 Due to her difficulties in the TA/SS Administrator position, Emery was placed on a "critical performance plan" on November 6, 1989. This plan identified the areas in which Emery was deficient and provided guidelines for improving her performance. The plan specifically stated that failure to correct the problems would result in termination.[2] Emery's difficulties continued after she was placed on the critical performance plan. Emery continued to miss deadlines and did not improve her productivity. On November 27, 1989 she was terminated.
 
 II
 
 11
 Plaintiff Emery contends on appeal that the district court erred in granting summary judgment to the defendants on her claims that she was subjected to a sexually hostile environment, that her employers engaged in retaliatory discharge, and that defendants intentionally inflicted emotional distress; she claims further that the district court erred in denying her request for a jury trial.
 
 A. SEXUALLY HOSTILE ENVIRONMENT
 
 12
 Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. Sec. 2000e-2(a)(1). A violation of Title VII occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 114 S.Ct. 367, 370 (1993) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)). Conduct that is not severe or pervasive enough that a reasonable person would find it hostile or abusive "is beyond Title VII's purview." Id. "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 371. Further, to establish a hostile work environment sexual harassment claim, the plaintiff must establish liability on the part of defendants based upon traditional agency principles. Kauffman v. Allied Signal, Inc., Autolite Div., 970 F.2d 178, 183-84 (6th Cir.), cert. denied, 113 S.Ct. 831 (1992).
 
 
 13
 In this case, plaintiff Emery was not subjected to a sexually hostile work environment. While the atmosphere of the maintenance department was certainly unpleasant,[3] it would have been so to a well-mannered person of either sex. Emery has alleged no actions either by Jett or any other employee of Brown-Forman which rise to the level of being "sufficiently severe or pervasive to alter the conditions of the victim's employment." Harris, 114 S.Ct. at 370. Nor did the admittedly foul atmosphere of the maintenance department rise to this level. The most severe episode described by Emery involved Jett's standing close to her and "invading her space" while offering her an alcoholic drink. This does not rise to the level of sexual harassment. As the district court noted, "[s]he has failed to produce any evidence that the obscene language or crude behavior of the personnel in the department was directed at her because of her sex."
 
 
 14
 Even if the acts complained of were found to constitute a hostile work environment, Emery would still not prevail since Brown-Forman cannot be held liable. An employer is not liable for the actions of its employees if it "adequately and effectively" deals with the alleged harassment. Kauffman, 970 F.2d at 184-85. In Kauffman, this Court held that the company acted "adequately and effectively" when it immediately terminated the wrongdoer's employment once put on notice. Id. In this case, Brown-Forman's response was sufficient to relieve it of liability. Once given notice of Jett's alleged harassment of Emery, Jett, along with another maintenance employee, was immediately suspended and later terminated. This prompt and decisive action is sufficient to relieve Brown-Forman of any liability in this matter for a sexually hostile work environment.[4]
 
 B. RETALIATORY TERMINATION
 
 15
 Emery also contends that she was denied upward mobility and ultimately terminated due to her refusal to return to the maintenance department.[5] Title VII expressly proscribes retaliation against anyone who "has opposed any practice made an unlawful employment practice" by Title VII or who "has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under" the statutory scheme. See 42 U.S.C. Sec. 2000e-3(a).
 
 
 16
 The elements of a prima facie case of retaliation are (1) that a plaintiff engaged in an activity protected by Title VII; (2) that the exercise of her protected rights was known to defendants; (3) that the defendants thereafter took an employment action adverse to plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. Wrenn v. Gould, 808 F.2d 493, 500 (6th Cir.1987); Canitia v. Yellow Freight Sys., 903 F.2d 1064, 1066 (6th Cir.) (per curiam), cert. denied, 498 U.S. 984 (1990).
 
 
 17
 In this case, Emery cannot meet the elements for a prima facie case of retaliation. Emery was not inhibited or punished because of her assertion of her Title VII rights.[6] Emery's retaliation claim is based on her refusal to return to the maintenance department. This is not a protected activity and the alleged retaliation by her employers is clearly not based on Emery's exercise of a protected activity.[7]
 
 The district court found:
 
 18
 There is no evidence whatsoever of retaliation based on sexual harassment or in response to plaintiff's assertion of any sexual harassment claim. If there was an increasing level of hostility toward the plaintiff, the record suggests it was motivated entirely by frustration with the dysfunctional working relationship between the parties and not by any sexual bias.
 
 
 19
 This view is supported by the record. Emery was not denied upward mobility in the company. In fact, she continuously earned raises and promotions until she ultimately achieved the TA/SS Administrator position. In this position, Emery encountered a myriad of well-documented difficulties. Her termination was not causally connected to her exercise of a protected right, but rather was due to her poor performance in her new position and her refusal to return to her old position in which she had been effective. Accordingly, we find that the district court was correct in granting summary judgment on Emery's retaliation claim.[8]
 
 
 20
 C. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
 
 
 21
 Emery's amended complaint charges Mateus and McCoskey with intentional infliction of emotional distress. The Supreme Court of Kentucky has identified the following elements for the tort of intentional infliction of emotional distress: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe. Craft v. Rice, 671 S.W.2d 247, 249 (Ky.1984); Humana of Ky., Inc. v. Seitz, 796 S.W.2d 1, 2-3 (Ky.1990).
 
 
 22
 In this case, the district court found, "[t]he remaining claim of intentional infliction of emotional distress against McCoskey and Mateus is without merit. The alleged conduct does not approach the level of outrageous conduct necessary to state a tort claim." See Humana 796 S.W.2d at 2-3. Emery claims that the district court "summarily dismissed" her intentional infliction of emotional distress claim due to unwarranted credibility determinations made in favor of defendants and that the district court overlooked conflicting evidence and failed to consider all of the evidence.
 
 
 23
 Emery's argument misses the point. On this record, credibility determinations are not necessary. It is clear there is no genuine issue of material fact since even if Emery's facts as alleged are all considered to be true, she has still failed to present evidence of conduct that is outrageous and intolerable in that it offends generally accepted standards of decency and morality. See Roush v. KFC Nat'l Management Co., 10 F.3d 392 (6th Cir.1993). The district court was correct in finding that none of the alleged conduct by Mateus or McCoskey is "outrageous." The district court was correct in granting summary judgment in favor of the defendants on this issue.
 
 D. DENIAL OF JURY TRIAL
 
 24
 Finally, Emery contends the district court erred in denying her request for a jury trial. Emery's request was made when she filed her amended complaint, over one year after filing her original complaint.
 
 
 25
 It is clear that Emery did not demand a jury trial within ten days of filing her complaint as required by the Federal Rules of Civil Procedure, and thus her right to trial by jury was waived. Fed.R.Civ.P. 38(b), (d). Emery argues that she did not have a "right" to a jury trial until the time of her amended complaint.
 
 
 26
 This Court, in a similar situation, affirmed the district court's refusal to grant a jury trial in Irvin v. Airco Carbide, 837 F.2d 724, 727 (6th Cir.1987). In Irvin, the plaintiff filed suit against his former employer claiming violations of his federal civil rights. Irvin did not make a timely request for a jury trial. Irvin then amended his complaint to add counts based on the Kentucky Civil Rights statute and 42 U.S.C. Sec. 1981. Id. This Court held that Irvin had waived his right to a jury trial by failing to make a demand within 10 days of his original complaint stating, "[t]he fact that an amended complaint was later filed is of no consequence when no new issues of fact are introduced." Id.
 
 
 27
 In this case, Emery alleged an additional cause of action based on the same set of facts in her amended complaint. No new issues of fact were introduced. The district court is accorded broad discretion in ruling on tardy motions for a jury trial. Misco, Inc. v. United States Steel Corp., 784 F.2d 198, 205 (6th Cir.1986). The district court did not abuse its discretion in denying Emery's motion for a jury trial. Also, any error that may have occurred is clearly harmless error since the case was properly disposed of on summary judgment.
 
 III
 
 28
 For the foregoing reasons, the district court's order granting summary judgment for the defendants is AFFIRMED.
 
 
 
 *
 The Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The Chairman's charters constituted ninety percent of all the charter flight work
 
 
 [2]
 The plan stated, "If the standard and results within each area are not met within the next 60 days, you will be terminated from your current position." Emery was actually terminated three weeks from the date of the institution of the plan
 
 
 [3]
 Emery's co-workers consistently engaged in crude talk and the bathroom, which she shared with her male co-workers, contained what the district court described as "girlie" magazines
 
 
 [4]
 Emery claims that the environment was still hostile after Jett left since the other employees did not like her role in Jett's termination. This claim is without merit since the hostility is not because of her sex
 
 
 [5]
 Emery alleges that she refused to go back due to the prior harassment (even though Jett had been terminated) since it would bring back bad memories. Emery testified that the "sole" reason for her supervisors' alleged retaliation and termination was due to her refusal to return to the maintenance department when given the option by Mateus. Emery has not alleged the termination was in retaliation for her allegations regarding Jett
 
 
 [6]
 Emery argues that she was denied promotions on the basis of her gender. This claim is based on her failure to attain three different advancement opportunities prior to her transfer to her TA/SS Administrator position. Two of the three positions were filled by other women, and one of these two would have been merely a leteral transfer. The third position was as Jett's assistant. Emery admitted that she did not apply for or express interest in that position, nor did she possess the necessary credentials for the position. Emery did not establish a prima facie case with regard to these positions and summary judgment was properly entered against her
 
 
 [7]
 Defendants observed in their brief, "In fact, the employer could have legally transferred her to the maintenance department at any time and terminated her for refusal to comply had it been so inclined."
 
 
 [8]
 The district court stated, "[b]ecause Kentucky's civil rights statute essentially tracks the Federal, that claim will be dismissed for the same reasons." Thus, we find it unnecessary to engage in a separate discussion of the Kentucky statute. Emery has not argued that state law differed in any material manner and has argued the sexual harassment issues solely on federal law